UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

BULOVA TECH RIVERSIDE LLC,   Case No. 8:10-bk-8500-MGW

   Debtor.   Chapter 11
_____/

# DEBTOR'S CHAPTER 11 CASE MANAGEMENT SUMMARY

Bulova Tech Riverside LLC ("Debtor"), by counsel, hereby files its Case Management Summary pursuant to the *Administrative Order Establishing Initial Procedures in Chapter 11 Cases filed in the United States Bankruptcy Court of the Middle District of Florida, Tampa-2009-1 (Administrative Order FLMB-2009-1 dated January 28, 2009)*, and states as follows:

**I.   Debtor's Business**

1. The Debtor is a Florida limited liability company formerly known as USSEC Riverside II, LLC. In November, 2009, USSEC Riverside II, LLC changed its name to Bulova Tech Riverside LLC.

2. The Debtor owns and operates a 465,000 square foot warehousing and light industrial multi-use facility located at 110 L.E. Barry Road in Natchez, Mississippi (the "Real Property"). The warehouse is located adjacent to the Natchez-Adams County Port on the Mississippi River, with both port and rail access. The Debtor also owns a non-contiguous separate parcel of property located at 91 Carthage Point Road in Natchez, Mississippi (the "Separate Property"), that it utilizes for various business purposes.

**II.     History of the Debtor**

3.    The Debtor was incorporated in June, 2006 and acquired the Real Property on December 12, 2006 pursuant to a contract to purchase that had been assigned to it from U.S. Sustainable Energy Corp., a Mississippi corporation ("USSEM"), an entity affiliated with the Debtor at that time.[1] The Debtor purchased the Real Property initially as a short-term investment with the intention that USSEM would lease, occupy, and ultimately repurchase the Real Property. The initial purchase price for the Real Property was approximately $5,700,000.00 paid in cash by the Debtor from funds contributed by the Debtor's initial members.

4.    Initially, the Debtor had two members, Denouement Strategies, Inc., a Florida corporation ("DSI"), and Jens Dalsgaard ("Dalsgaard"), an individual, who provided the initial funds required for the purchase of the Real Property. Ultimately, DSI funded approximately $4,600,000.00 of the total purchase price and owned 80.02% of the membership interest in the Debtor and Dalsgaard and/or affiliates funded approximately $1,150,000.00 of the purchase price and owned 19.98% of the membership interest in Debtor. Dalsgaard subsequently conveyed his interest in the Debtor to John Stanton, the current manager of the Debtor and shareholder in DSI. As part of that transaction, Dalsgaard also conveyed the Separate Property to the Debtor.

5.    Through early 2008, the Real Property was used by USSEM in connection with its development and manufacture of biofuel and alternative fuel technologies and equipment and in connection with various applications developed by Earth First Technologies, Inc. ("EFTI"), another affiliated entity.[2]

---

[1] USSEM had originally contracted to purchase the Real Property as a development and manufacturing location for its biofuel and alternative fuel technologies and equipment. USSEM is a distinct corporate entity from U.S. Sustainable Energy Corporation, a Florida Corporation ("USSEF"), which remains an affiliate of the Debtor.

[2] EFTI is a Debtor before this Court in case number 8:08-bk-08639-MGW.

6. Once the Debtor determined that USSEM would not be able or willing to lease, purchase, or refinance the Real Property to allow the Debtor to recover its initial investment, the Debtor sought various financing alternatives, including the sale, lease, or third-party financing of the Real Property. USSEM was removed from the Real Property in March of 2008. Since mid-2008, the Real Property has been utilized primarily as a warehouse and distribution center for freight and cargo moving through the Port of Natchez. During that period, the Debtor also began negotiation for the long-term lease of the Real Property (the "BLVT Lease") with Bulova Technologies Group ("BLVT"), also an affiliated entity. The Debtor believes a long term BLVT Lease would enhance the value and marketability of the Real Property and provide substantial income and cash-flow to the Debtor.

7. During that time, BLVT, the Debtor, and Park Avenue Bank ("PAB") also entered into negotiations and agreements for a global financing transaction whereby BLVT would lease the Real Property from the Debtor and PAB, either singularly or with other participant lenders, would provide between $5,500,000.00 and $9,000,000.00 in financing to BLVT for its operations and expansion (the "BLVT Financing"). In connection with these negotiations and agreements, and based on PAB's representations as to the BLVT Financing, in March, 2009, the Debtor executed a Deed of Trust and Security Agreement in favor of PAB (the "PAB DOT") to secure certain pre-existing obligations of BLVT and other affiliated entities to PAB.

### III. Current Business Challenges and Opportunities

8. The Debtor currently generates sufficient income to sustain its ordinary operations. Prior to the execution of the PAB DOT, PAB made certain advances and engaged in other financial transactions with BLVT and affiliates. In March of 2009, the Debtor executed the PAB DOT to secure those pre-existing debts, advances, and obligations of affiliated entities to PAB. On its face,

{00129188.DOC;5}

Page 3 of 8

the PAB DOT secured a short-term six-month commitment evidenced by a Revolving Line of Credit Secured Promissory Note (the "Note") dated March 18, 2009, in the principal amount of up to $1,500,000.00 that the Debtor understood would be renewed or satisfied as part of the much larger financing transactions of up to $9,000,000.00 between PAB and BLVT.[3]  After the delivery of the POB DOT, the Debtor made significant repairs, renovations, and improvements to the Real Property in anticipation of the BLVT Lease, the BLVT Financing, and/or other possible sale, lease, or financing transactions.

9.      Pursuant to the Note, the Debtor was required to make monthly payments of interest only from April 1, 2009, through September 1, 2009, the maturity date.  However, during the summer of 2009, the Debtor became aware that PAB would be unable to extend the contemplated BLVT Financing.  The Debtor and PAB entered into negotiations to otherwise renew or extend the maturity date of the Note beyond September, 2009.  From September 2009 through March, 2010, the Debtor and BLVT attempted to negotiate with PAB as to an extension of the term of the Note and to extend or obtain alternatives to the BLVT Financing.  During most of that period (through about January, 2010) the Debtor continued to make monthly interest payments on the Note.  However, on or about March 12, 2010, PAB was closed by the NYSBD and the FDIC was named receiver for PAB. On that same date, the Debtor received notice by the substitute trustee under the PAB DOT that the Real Property would be sold at non-judicial foreclosure sale on April 13, 2010.

---

[3] At the time of the execution of the Note and the PAB DOT, PAB was operating under a consensual "cease and desist order" from Federal Deposit Insurance Company (the "FDIC") and New York State Banking Department ("NYSBD") with respect to unsafe or unsound banking practices.

**IV. Existing Debt and Equity Structure**

10. The Debtor's secured creditor is PAB or its assigns[4] that claim a lien on the Real Property under the PAB DOT. The Debtor's two members are DSI and John Stanton ("Stanton"), individually.

**V. Location of Debtor's Operations**

11. The Debtor operates a warehouse located at 110 L.E. Barry Road in Natchez, Adams County, Mississippi. The Separate Property is located at 91 Carthage Point Road in Natchez, Adams County, Mississippi.

**VI. Reasons for Filing Chapter 11**

12. On March 12, 2010, the Substitute Trustee issued the *Substituted Trustee's Notice of Sale*, alleging a default under the Deed of Trust and Note and scheduling a non-judicial foreclosure sale of the Real Property for April 13, 2010 (the "Foreclosure Sale").

13. As a result of the scheduled Foreclosure Sale, and the unsuccessful attempts to negotiate any forbearance or delay of the Foreclosure Sale or other resolution with PAB or any subsequent holder of the Note, the Debtor believed it had no choice but to seek relief under chapter 11, in order to preserve the substantial equity the Debtor has in the Real Property and the value of the Separate Property.

**VII. List of Officers and Directors, Salaries and Benefits**

14. The Debtor is a Florida limited liability company. Denouement Strategies, Inc. owns 80.02% of the membership interests in the Debtor and Stanton owns 19.98% of the membership interests in the Debtor by virtue of the conveyance of membership interest from

---

[4] On information and belief, the Note and PAB DOT was assigned by the FDIC to Valley National Bank of Wayne, New Jersey.

{00129188.DOC;5}
Page 5 of 8

Dalsgaard. Stanton is the manager of the Debtor. Stanton does not receive any compensation or benefits from the Debtor.

15. The Debtor employs Norma Jones ("Jones") who manages the day-to-day business operations of the warehouse and Chris Barbee ("Barbee") manages the warehouse operations. Neither Jones nor Barbee are officers, directors, or members of the Debtor. Barbee is Stanton's son-in-law.

**VIII. Debtor's Annual Gross Revenues**

16. The Debtor had approximately $350,000.00 in gross revenue for the fiscal year that ended December 31, 2008. The Debtor estimates its annual revenue for 2009 was $450,000.00.

**IX. Amounts Owed to Various Classes of Creditors**

17. The Debtor does not believe that any significant pre-petition obligations are owed to creditors entitled to priority for taxes, wages, salaries, or benefits other than any unpaid payroll and payroll obligations that existed as of the Petition Date. The Debtor owes approximately $4,500.00 for payroll due from March 31, 2010 through April 9, 2010 (the "Stub Period") and will file a motion seeking authority to pay the Stub Period Wages.

18. PAB claims that it is owed approximately $1,500,000.00 under the Note. The Debtor owes approximately $65,000.00 to the Adams County Tax Collector (the "ACTC") for 2009 real property taxes.

19. The Debtor estimates that aggregate general unsecured claims as of the Petition Date are approximately $39,000 and consist primarily of trade debt.

**X.     General Description and Approximate Value of the Debtor's Current and Fixed Assets**

20.     The Debtor's collective fixed assets including the Real Property, plant, and equipment, net of depreciation are reflected as having a "net book value" as of December, 2008 of $5,557,223.00.  Based on recent appraisals obtained in connection with the proposed BLVT Financing, the Debtor believes the actual fair market value of the Real Property is in excess of $7,600,000.00 based on a 2009 appraisal.  The Debtor believes the Separate Property has a value of approximately $200,000.00.

**XI.    Number of Employees and Amounts of Wages Owed as of Petition Date**

21.     As of the Petition Date, the Debtor had five (5) full-time and two (2) part-time employees who were owed gross pay of approximately $5,206.00 (through April 12, 2010).

**XII.   Status of Debtor's Payroll and Sales Tax Obligations**

22.     The Debtor owes approximately $59,000.00 in pre-petition payroll tax obligations to the Internal Revenue Service.  In addition, the Debtor owes the Mississippi Department of Employment Security approximately $3,800.00 in connection with unemployment taxes and owes the Mississippi State Tax Commission approximately $8,700.00 for state withholding taxes.

23.     The Debtor's first scheduled post-petition payroll was to be paid on April 15, 2010, for the pay period of April 1, 2010 through April 14, 2010 (for full-time employees) and April 9, 2010 (part-time employees).

**XIII.  Anticipated Emergency Relief to be Requested Within 14 Days from the Petition Date**

*Debtor's Application for Interim and Final Orders Authorizing Employment of Jennis & Bowen, P.L. as Counsel for Debtor*

*Debtor's Emergency Motion for Authority to Pay Pre-Petition Wages*

Potential *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection*[5]

Dated this 16th day of April, 2010.

                                        */s/ David S. Jennis*
                                        David S. Jennis
                                        Florida Bar No. 775940
                                        **Jennis & Bowen**
                                        400 N. Ashley Dr., Ste. 2540
                                        Tampa, FL 33602
                                        Telephone: (813) 229-1700
                                        Facsimile: (813) 229-1707
                                        Attorneys for the Debtor

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF electronic service to **United States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL 33602 and to those parties receiving electronic notices via CM/ECF on this 16th day of April, 2010.

                                        */s/ David S. Jennis*
                                        David S. Jennis

---

[5] The Debtor is currently analyzing whether any of its property constitutes "cash collateral" as that term is defined in Section 363(a) of the Bankruptcy Code as it believes PAB's lien under the PAB DOT may only extend to real property and fixtures. No UCC-1 Filing Statement appears to have been filed by PAB with the Secured Transactions Registry in Florida or in the Department of Business Services in Mississippi.