UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

BULOVA TECH RIVERSIDE LLC,          Case No. 8:10-bk-8500-MGW

        Debtor.                Chapter 11

_____/

**DISCLOSURE STATEMENT WITH RESPECT TO**
**CHAPTER 11 PLAN FOR**
**BULOVA TECH RIVERSIDE, LLC**

David S. Jennis
Florida Bar No. 775940
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
Email: djennis@jennisbowen.com
Counsel to the Debtor and
Debtor-in-Possession

Dated: July 13, 2010

# PRELIMINARY STATEMENT

This Disclosure Statement ("Disclosure Statement") is submitted by Bulova Tech Riverside, LLC ("Riverside" or "Debtor") pursuant to Section 1125 of the Bankruptcy Code in connection with the Chapter 11 Plan for Bulova Tech Riverside, LLC, dated as of July 9, 2010 (the "Plan"), proposed by Riverside in its Reorganization Case under Chapter 11 of the Bankruptcy Code. A copy of the Plan is attached as **Exhibit "A"** hereto. For purposes hereof, all capitalized terms used in this Disclosure Statement, and not otherwise separately defined herein, shall have the meanings ascribed to such terms in the Plan, as the Plan may be amended, modified, or supplemented from time to time. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical reasonable investor typical of the holders of Claims and Interests in the Classes of Claims and Interests entitled to vote pursuant to the Plan to make an informed judgment whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**NO STATEMENT OR INFORMATION CONCERNING THE DEBTOR (PARTICULARLY AS TO FUTURE BUSINESS, RESULTS OF OPERATIONS OR FINANCIAL CONDITION, OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF ITS ASSETS, PROPERTY, OR BUSINESS THAT IS GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND INFORMATION ABOUT THE DEBTOR AND THE FINANCIAL INFORMATION OF THE DEBTOR, INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS OR INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTOR OR PROVIDED TO THE DEBTOR'S PROFESSIONALS BY THE DEBTOR. THE DEBTOR HAS NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIMS ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION**

SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL CONSEQUENCES OR EFFECTS OF THE REORGANIZATION OF THE DEBTOR. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND THEREFORE INCLUDES ESTIMATES, ASSUMPTIONS, AND PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN.

IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND FILING IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, SUITE 555, TAMPA, FLORIDA 33602.

## OVERVIEW OF THE PLAN

The following is a brief summary of certain information contained elsewhere in this Disclosure Statement and the Plan. The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement and the Exhibits thereto, and the Plan Documents.

The essential elements of the Liquidating Plan include, among other things:

(a)     the continued operation of the Debtor's business as a warehouse/distribution center;

(b)     the Debtor's entry into a short term lease with Bulova Technologies Group, Inc. ("BLVT") to provide additional cash to fund payments to be made on the Effective Date of the Plan and to establish a "Secured Claims Fund" to

establish a payment reserve ("Secured Claims Fund") for payments on account of Allowed Secured Claims;

(c)     the sale of the Debtor's Carthage Road Property (defined in the Plan as the "Separate Property") to pay Allowed Secured Tax Claims and Priority Tax Claims;

(d)     the payment of Administrative and Priority Claims in full on the Effective Date of the Plan  in accordance with the requirements of the Bankruptcy Code;

(e)     the Sale or refinancing of the Debtor's warehouse facility defined in the Plan as the "Primary Property" within a twenty-four (24) month period and the payment in full of all Allowed Claims secured by the Primary Property from the proceeds of Sale; and

(f)     the payment of all Unsecured Claims in full through two (2) payments with the first occurring within ninety (90) days of the Effective Date and the second occurring within fifteen (15) days of the closing of the sale of the Separate Property and upon the closing of the Sale or refinancing of the Primary Property.

**THE DEBTOR BELIEVES THAT IT IS IN THE BEST INTERESTS OF ALL PARTIES TO VOTE TO ACCEPT THE PLAN BECAUSE THE PLAN FAIRLY AND EQUITABLY TREATS ALL HOLDERS OF CLAIMS BY PROVIDING THE EARLIEST POSSIBLE AND MAXIMUM RECOVERY TO SUCH HOLDERS.**

## ARTICLE 1
## INTRODUCTION

1.1     Purpose of the Disclosure Statement.

The Debtor submits this Disclosure Statement, pursuant to Section 1125 of the Bankruptcy Code, to all known holders of Claims against, or Interests in, the Debtor, for the purpose of disclosing that information which the Bankruptcy Court has determined is material, important, and necessary for holders of Claims and Interests of the Debtor to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

1.2     Explanation of the Reorganization Process.

**(a)     Purpose of Chapter 11**.  Chapter 11 of the Bankruptcy Code is often called "commercial bankruptcy."  Chapter 11 contemplates the formulation of a plan of reorganization and outlines how a debtor's debts will be paid.  Unlike cases under Chapter 7, 12, or 13 of the Bankruptcy Code, a trustee is not ordinarily appointed in a Chapter 11 case.  Instead, the debtor remains in control of its assets and business affairs as a "debtor in possession" with most of the powers and duties of a trustee.  In addition to statutory requirements relating to plan formulation, confirmation, and post-confirmation

matters, a Chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors in order to allow the debtor breathing space within which to reorganize. The Bankruptcy Code contains a number of other significant provisions applicable to Chapter 11 cases, such as those relating to post-petition financing and pre-petition executory contracts, which confer powers on the debtor-in-possession and also provide creditors with certain rights and remedies.

        **(b)**     **Formulation of the Plan**. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. A plan of reorganization sets forth the means by which claims against, and interests in, the debtor will be satisfied. After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization. This Disclosure Statement is presented to holders of Claims and Interests to satisfy the disclosure requirements of Section 1125 of the Bankruptcy Code.

     **1.3**   <u>Approval of Disclosure Statement</u>.

     By Order of the Bankruptcy Court, this Disclosure Statement was conditionally approved.

     **1.4**   <u>Voting Procedures</u>.

        **(a)**     **Persons Entitled to Vote**. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are impaired[1] under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Furthermore, if a Class of Claims or Interests is not entitled to receive any distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such holder, temporarily allows the Claim in an amount which it deems proper for purposes of voting to accept or reject the Plan. Any such motion must be heard and determined by the Bankruptcy Court in accordance with Bankruptcy Rule 3018(a).

---

[1] Under Section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan of reorganization unless, with respect to each claim or interest in such class, the plan in question: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default – (A) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**(b)     Voting Instructions**.

(1)     <u>Ballots</u>.  In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement.  If you have Claims or Interests in more than one Class or with respect to more than one of the Debtors, you will receive multiple ballots.  **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND SHOULD COMPLETE AND RETURN ALL BALLOTS.**

(2)     <u>Returning Ballots</u>.  **YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, SUITE 555, TAMPA, FLORIDA 33602, ON OR BEFORE 4:00 P.M., EASTERN TIME ON _____, 2010.**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE FILED WITH THE BANKRUPTCY COURT ON OR BEFORE 4:00 P.M., EASTERN TIME, ON _____, 2010.**

**IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

(3)     <u>Incomplete or Irregular Ballots</u>.  Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtor. **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

1.5     <u>Confirmation</u>.

**(a)     Confirmation Requirements**.  Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan for it to be confirmed by the Bankruptcy Court.  For any Class of "impaired" Claims to accept the Plan, Section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and two-thirds (2/3) in the amount of the Allowed Claims in such Class that actually vote on the Plan must vote to accept the Plan.  For a Class of impaired Interests to accept the Plan, Section 1126(d) of the Bankruptcy Code requires that holders of two-thirds (2/3) in amount of the Allowed Interests in such Class that actually vote on the Plan must vote to accept the Plan.

Even if all Classes of Claims and Interests accept the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the Plan is in the best interests of holders of Claims and Interests.  Section 1129 generally requires that the value to be distributed to holders of Claims and Interests may not be less than such parties would receive if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

**(b)    Cramdown**. Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though less than all of the Classes of Claims and Interests accept it. Confirmation of the Plan over the objection of one or more impaired Classes of Claims or Interests is generally referred to as a "cramdown." For the Plan to be confirmed over the objection of an impaired Class of Claims or Interests, the Debtor must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. In order to fulfill this requirement with respect to a Class of Unsecured Claims that has not accepted the Plan, the Debtor must show that (i) the Plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date, equal to the Allowed Amount of such Claim or (ii) the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the Plan on account of such junior Claim or Interest any property.

**(c)    Confirmation Hearing**. The Bankruptcy Court has set a Confirmation Hearing with respect to the Plan. Each party in interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan. The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

**(d)    Feasibility of the Plan**. The terms proposed by the Debtor for the treatment of Allowed Claims and Allowed Interests under the Plan are based upon, among other things, the assessment by the Debtor of the relative priority afforded to various Claims and Interests under the Bankruptcy Code and the Debtor's ability to repay each of the obligations consistent based on current facts and circumstances. **WHILE THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE SUCCESSFUL, THE DEBTOR BELIEVES THAT REORGANIZATION UNDER THE PLAN DOES PROVIDE FOR THE GREATEST AND EARLIEST RECOVERIES FOR ALL HOLDERS OF CLAIMS AND INTERESTS.**

**(e)    Effect of Confirmation**. Confirmation makes the Plan binding upon the Debtor, all holders of Claims and Interest and other parties in interest, regardless of whether or not it has been accepted by them.

1.6    Procedure for Filing Proofs of Claim and Proofs of Interest.

**(a)    Bar Dates**.

(1)    General Bar Date for Claims. All Proofs of Claim of must have been filed by the close of business on June 28, 2010 (the "General Claims Bar Date"). **IF A CLAIM WAS LISTED IN THE SCHEDULES AS NON-CONTINGENT, LIQUIDATED, AND UNDISPUTED, A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.** Both the Schedules and the docket listing Proofs of Claim that were filed on or before the General Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(2)     Administrative Claims Bar Date.  Unless otherwise ordered by the Bankruptcy Court, the Confirmation Order will establish a bar date for Administrative Claims, which bar date shall be thirty (30) days after the Effective Date. Holders of Administrative Claims that are paid on the Effective Date may file a Request for Payment of Administrative Expense on or before such bar date.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(f) and 3020(c) will set forth such date and constitute notice of the Administrative Claims bar date.  Reorganized Riverside and any other party in interest will have sixty (60) days after the Administrative Claims bar date to review and object to such Administrative Claims before a hearing for determination of such Claims is held by the Bankruptcy Court.

(b)     **Executory Contracts and Unexpired Leases**.  Parties to any executory contracts or unexpired leases that are rejected by the Debtor under the Plan must file any Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date.  Parties to executory contracts or unexpired leases that were or may be rejected by the Debtor by motion or otherwise before Confirmation must file Proofs of Claim for any rejection damages in accordance with the Bankruptcy Court's Order with respect to such rejection.

## ARTICLE 2
## THE REORGANIZATION CASE

2.1   History of the Debtor.

Riverside is a Florida limited liability company formerly known as USSEC Riverside II, LLC.   In November 2009, USSEC Riverside II, LLC changed its name to Bulova Tech Riverside LLC.  The Debtor owns and operates a 465,000 square foot warehousing and light industrial multi-use facility located at 110 L.E. Barry Road in Natchez, Mississippi (the "Primary Property").   The warehouse is located adjacent to the Natchez-Adams County Port on the Mississippi River, with both port and rail access.  The Debtor also owns a non-contiguous separate parcel of property located at 91 Carthage Point Road in Natchez, Mississippi (the "Separate Property"), that it utilizes for various business purposes.  The Debtor was incorporated in June, 2006 and acquired the Primary Property on December 12, 2006 pursuant to a contract to purchase that had been assigned to it from U.S. Sustainable Energy Corp., a Mississippi corporation ("USSEM"), an entity affiliated with the Debtor at that time.[2]  The Debtor purchased the Primary Property initially as a short-term investment with the intention that USSEM would lease, occupy, and ultimately repurchase the Primary Property.  The initial purchase price for the Primary Property was approximately $5,700,000.00 paid in cash by the Debtor from funds contributed by the Debtor's initial members.

Initially, the Debtor had two members, Denouement Strategies, Inc., a Florida corporation ("DSI"), and Jens Dalsgaard ("Dalsgaard"), an individual, who provided the

---

[2] USSEM had originally contracted to purchase the Primary Property as a development and manufacturing location for its biofuel and alternative fuel technologies and equipment.  USSEM is a distinct corporate entity from U.S. Sustainable Energy Corporation, a Florida Corporation ("USSEF"), which remains an affiliate of the Debtor.

initial funds required for the purchase of the Primary Property. Ultimately, DSI funded approximately $4,600,000.00 of the total purchase price and owned 80.02% of the membership interest in the Debtor and Dalsgaard and/or affiliates funded approximately $1,150,000.00 of the purchase price and owned 19.98% of the membership interest in Debtor. Dalsgaard subsequently conveyed his interest in the Debtor to John Stanton, the current manager of the Debtor and shareholder in DSI. As part of that transaction, Dalsgaard also conveyed the Separate Property to the Debtor.

Through early 2008, the Primary Property was used by USSEM in connection with its development and manufacture of biofuel and alternative fuel technologies and equipment and in connection with various applications developed by Earth First Technologies, Inc. ("EFTI"), another affiliated entity.

Once the Debtor determined that USSEM would not be able or willing to lease, purchase, or refinance the Primary Property to allow the Debtor to recover its initial investment, the Debtor sought various financing alternatives, including the Sale, lease, or third party financing of the Primary Property. USSEM was removed from the Primary Property in March of 2008. Since mid-2008, the Primary Property has been utilized primarily as a warehouse and distribution center for freight and cargo moving through the Port of Natchez. During that period, the Debtor also began negotiation for the long-term lease of the Primary Property (the "BLVT Lease") with BLVT, also an affiliated entity. The Debtor believes a long term BLVT Lease would enhance the value and marketability of the Primary Property and provide substantial income and cash flow to the Debtor.

During that time, BLVT, the Debtor, and Park Avenue Bank ("PAB") also entered into negotiations and agreements for a global financing transaction whereby BLVT would lease the Primary Property from the Debtor and PAB, either singularly or with other participant lenders, would provide between $5,500,000.00 and $9,000,000.00 in financing to BLVT for its operations and expansion (the "BLVT Financing"). In connection with these negotiations and agreements, and based on PAB's representations as to the BLVT Financing, in March 2009, the Debtor executed a Deed of Trust and Security Agreement in favor of PAB (the "PAB DOT") to secure certain pre-existing obligations of BLVT and other affiliated entities to PAB.

2.2   Factors Precipitating the Reorganization Case.

The Debtor currently generates sufficient income to sustain its ordinary operations. Prior to the execution of the PAB DOT, PAB made certain advances and engaged in other financial transactions with BLVT and affiliates. In March of 2009, the Debtor executed the PAB DOT to secure those pre-existing debts, advances, and obligations of affiliated entities to PAB. On its face, the PAB DOT secured a short-term six-month commitment evidenced by a Revolving Line of Credit Secured Promissory Note (the "Note") dated March 18, 2009, in the principal amount of up to $1,500,000.00 that the Debtor understood would be renewed or satisfied as part of the much larger

financing transactions of up to $9,000,000.00 between PAB and BLVT.[3]  After the delivery of the PAB DOT, the Debtor made significant repairs, renovations, and improvements to the Primary Property in anticipation of the BLVT Lease, the BLVT Financing, and/or other possible sale, lease, or financing transactions.

Pursuant to the Note, the Debtor was required to make monthly payments of interest only from April 1, 2009, through September 1, 2009, the maturity date. However, during the summer of 2009, the Debtor became aware that PAB would be unable to extend the contemplated BLVT Financing.  The Debtor and PAB entered into negotiations to otherwise renew or extend the maturity date of the Note beyond September 2009.  From September 2009 through March 2010, the Debtor and BLVT attempted to negotiate with PAB as to an extension of the term of the Note and to extend or obtain alternatives to the BLVT Financing.  During most of that period (through about January 2010) the Debtor continued to make monthly interest payments on the Note. However, on or about March 12, 2010, PAB was closed by the NYSBD and the FDIC was named receiver for PAB.  On that same date, the Debtor received notice by the substitute trustee under the PAB DOT that the Primary Property would be sold at non-judicial foreclosure sale on April 13, 2010.

On March 12, 2010, the Substitute Trustee issued the *Substituted Trustee's Notice of Sale*, alleging a default under the Deed of Trust and Note and scheduling a non-judicial foreclosure sale of the Primary Property for April 13, 2010 (the "Foreclosure Sale").

As a result of the scheduled Foreclosure Sale, and the unsuccessful attempts to negotiate any forbearance or delay of the Foreclosure Sale or other resolution with PAB or any subsequent holder of the Note, the Debtor believed it had no choice but to seek relief under chapter 11, in order to preserve the substantial equity the Debtor has in the Primary Property and the value of the Separate Property.

2.3  Significant Events in the Reorganization Cases.

On April 12, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business and managed its assets as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.  To ensure the continuation of normal business operations and preserve the value of the business, the Bankruptcy Court authorized the Debtor to continue certain business activities.

On April 27, 2010, the Debtor filed *Debtor's Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection* (Doc. No. 17) requesting authorization to use the cash collateral on an interim basis, granting replacement liens to Valley National Bank, as successor to the rights of PAB ("Valley National"), and scheduling a final hearing.  A preliminary hearing was held on May 5, 2010 and interim use of the cash collateral was authorized at that hearing.  A final

---

[3] At the time of the execution of the Note and the PAB DOT, PAB was operating under a consensual "cease and desist order" from Federal Deposit Insurance Company (the "FDIC") and New York State Banking Department ("NYSBD") with respect to unsafe or unsound banking practices.

hearing has been scheduled for August 25, 2010 in conjunction with the Scheduled Hearing on Confirmation of the Plan.

On May 19, 2010, M&I Bank filed Claim 4 asserting a secured claim in the amount of $2,842,542.67 based on a purported "equitable lien" and final judgment (the "Judgment") entered against John Stanton ("Stanton") and others on July 22, 2009 in the state court action styled *M&I Marshall & Ilsley Bank vs. Renew Energy Resources, Inc., John D. Stanton, Alex H. Edwards, III, Walter S. Roder, and Joanne S. Roder,* Case No. 08-CA-28892, pending in the Circuit Court, Hillsborough County, Florida (the "State Court Action"). The Debtor was not a party to the State Court Action and the Proof of Claim does not evidence any direct obligation by the Debtor to M&I Bank.

On April 3, 2010, M&I Bank filed its *Motion for Relief from Automatic Stay* (Doc. No. 30) (the "Motion") seeking relief from the automatic stay imposed under Section 362(a) of the Bankruptcy Code to exercise its state court rights of levy and execution against the equity interests of the Debtor and a subsequent sale of the Debtor's property in order to satisfy the Judgment. In the Motion, M&I Bank alleges that "creditors of the estate and their prospect for payment would undoubtedly be enhanced by M&I Bank's execution upon the equity interest of the Debtor and the sale of the Debtor's property."

In M&I Bank's "Attachment to Proof of Claim," associated with Claim 4, M&I Bank references and attaches as exhibits (i) a promissory note given by Renew Energy Resources, Inc. ("Renew") to M&I Bank in the principal amount of $2,500,000, (ii) a revolving line of credit agreement between Renew and M&I Bank (the "Line of Credit"), (iii) a guaranty agreement for the benefit of Renew between Stanton and M&I Bank (the "Guaranty"), (iv) a post closing agreement entered into between M&I Bank, Renew, Stanton, and Alex Edwards (the "Post Closing Agreement"), and (v) a final summary judgment on count IV (the "Final Judgment") entered in the State Court Action.

M&I Bank states in the "Attachment to Proof of Claim," that its $2,842,542.67 secured claim is based on and calculated in connection with the note, the Line of Credit, the Guaranty, the Post Closing Agreement, and the Final Judgment (collectively, the "Renew Documents").

However, M&I Bank fails to attach any documentation reflecting the actual grant and conveyance of any lien or interest in the Debtor's property or any other documentation reflecting a debt of the Debtor to M&I Bank, other than the Post Closing Agreement, which was not even executed by the Debtor. M&I Bank attaches no documentation reflecting the perfection of its equitable lien. Accordingly, the Debtor filed its *Objection to Claim No. 4 Filed by M&I Marshall & Ilsley Bank* (Doc. No. 43) objecting to Marshall & Ilsley Bank's assertion of a lien on the Primary Property and to the existence and amount of any claim asserted by M&I Bank against the Debtor. A final

evidentiary hearing on M&I Bank's *Motion for Relief from Stay* and the Debtor's Objection to M&I Bank's claim has been scheduled for August 25, 2010 at 1:30 p.m.[4]

### 2.4 Historical Financial Information.

The Debtor's most recent historical financial information and results are in the Audited Financial Statements for Period Ending December 31, 2008 prepared by the Gillon Group and attached to this Disclosure Statement as **Exhibit "B."** The Debtor is in the process of finalizing a similar report for 2009 and will supplement this Disclosure Statement upon completion.

### 2.5 Operations during the Bankruptcy Case.

The Debtor's actual financial performance is reflected in the monthly operating reports that have been filed with the Bankruptcy Court. While those reports are not audited, those monthly reports are prepared at the request of and reviewed by the Debtor's management and accurately reflect the Debtor's operations.

### 2.6 Description of the Debtor's Assets.

The Debtor's primary asset is the Primary Property which is described in detail on **Exhibit "C"** to this Disclosure Statement. In October 2005, the Debtor obtained an appraisal valuing the Primary Property at $8,900,000. In January 2009, the Debtor obtained an appraisal more conservatively valuing the Primary Property at $7,600,000. The ultimate value of the Primary Property may be dependent on the Debtor's ability to procure a long-term lease of the Primary Property from BLVT or other tenant as proposed in the Plan. The Debtor believes that the "fire sale" or liquidation value of the Primary Property may be substantially less than the appraised amounts.

The Debtor believes that the fair market value of the Separate Property is between $160,000 and $200,000 with a reduced amount obtained through forced sale.

### 2.7 Claims Summary.

A summary of the currently scheduled and filed claims against the Debtor in the Bankruptcy Case is attached to this Disclosure Statement as **Exhibit "D."**

---

[4] In the anticipation that the Debtor and M&I Bank may consensually resolve their differences and to provide for any Allowed Secured Claim M&I Bank may have against the Primary Property, the Debtor classifies and treats M&I Bank in Class 4 of the Plan.

**ARTICLE 3**
**CLASSIFICATION AND TREATMENT OF**
**CLAIMS AND INTERESTS AND RELATED ISSUES**

3.1    Classification.

**(a)    General**.  Section 3.2 herein sets forth a designation of Classes of Claims and Equity Interests.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class.

**(b)    Unclassified Claims**.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes established in Section 3.2 herein.  The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article 2 of the Plan.

3.2    Classes.

For the purposes of the Plan, the Claims against, or Equity Interests in, the Debtor are grouped in the following Classes in accordance with Section 1122(a) of the Bankruptcy Code:

(1)    Class 1 - Priority Claims.  Class 1 consists of all Priority Claims.

(2)    Class 2A - Secured Tax Claims of Adams County Tax Collector (Primary Property).  Class 2A consists of the Secured Tax Claim of Adams County Tax Collector ("Adams County") for 2009 real and personal property taxes secured by a first priority tax lien on the Primary Property against which property taxes were assessed.

(3)    Class 2B – Secured Tax Claims of Adams County Tax Collector (Separate Property).  Class 2B consists of the Secured Tax Claim of Adams County for real and personal property taxes secured by a first priority tax lien on the Separate Property against which property taxes were assessed.

(4)    Class 3 - Secured Claims of Valley National.  Class 3 consists of the Secured Claims of Valley National secured by a mortgage lien and security interest in the Primary Property.

(5)    Class 4 - Secured Claim of M&I Bank.  Class 4 consists of any Secured Claim of M&I Bank to the extent any amounts owed constitute a liability of the Debtor or are secured by a lien on property of the Debtor.

(6)    Class 5 - Secured Claim of Mississippi State Tax Commission.  Class 5 consists of any Secured Claim of the Mississippi State Tax

Commission ("MSTC") for state income tax withholding to the extent secured by a valid and unavoidable lien on property of the Debtor and any interest accruing thereon.

(7)     Class 6 - General Unsecured Claims.  Class 6 consists of General Unsecured Claims not otherwise classified.

(8)     Class 7 - Small Claims.  Class 7 consists of the Small Claims less than $300.

(9)     Class 8 - Equity Interests in the Debtor.  Class 8 consists of all Equity Interests.

## ARTICLE 4
## IDENTIFICATION OF CLAIMS AND INTERESTS
## IMPAIRED AND NOT IMPAIRED BY THE PLAN

4.1   Classes of Claims and Interests Not Impaired by the Plan.

Classes 1, 7, and 8 are Unimpaired by the Plan.  Under Section 1126(f) of the Bankruptcy Code, the Holders of those Claims and Equity Interests are presumed conclusively to have voted to accept the Plan and, therefore, the votes of those Holders shall not be solicited.

4.2   Classes of Claims Impaired by the Plan.

Classes 2A, 2B, 3, 4, 5, and 6 are Impaired by the Plan.  Holders of Claims in Classes 2A, 2B, 3, 4, 5, and 6 are entitled to vote to accept or reject the Plan.

## ARTICLE 5
## TREATMENT OF ALLOWED CLAIMS AND ALLOWED INTERESTS

The Debtor has analyzed the Proofs of Claim filed in the Reorganization Case, as well as the Claims scheduled by the Debtor for which no Proofs of Claim were filed.  The estimated Allowed Claims and estimated recoveries in the Reorganization Case are summarized below.  Certain estimated Allowed Claims and estimated recoveries set forth below represent the best estimates of the Debtor and its professionals based upon the information available to them.  **THE DEBTOR AND ITS PROFESSIONALS HAVE EXPENDED CONSIDERABLE TIME AND EFFORT TO ENSURE THE ACCURACY OF THE ESTIMATED INFORMATION SET FORTH BELOW; HOWEVER, NO REPRESENTATION CAN BE MADE THAT SUCH INFORMATION IS WITHOUT INACCURACY.  THE INFORMATION SET FORTH BELOW IS SUBJECT TO THE UNCERTAINTIES OF LITIGATION WITH RESPECT TO MANY CLAIMS AND INTEREST AND OTHER FACTORS WHICH MAY OR MAY NOT BE RESOLVED IN THE DEBTOR'S FAVOR, THEREFORE, NO ASSURANCE CAN BE GIVEN THAT THE ESTIMATED ALLOWED CLAIMS AND INTERESTS ARE EXACT OR THAT THE ESTIMATED RECOVERIES WILL BE ACHIEVED.**

The Allowed Claims and Allowed Equity Interests, as classified in Article 3 herein, shall be satisfied in the manner set forth in this Article 5. The treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims and Allowed Equity Interests.

### 5.1 Claims and Equity Interests.

The following summarizes the treatment under the Plan of the Allowed Claims and Allowed Equity Interests:

| Class Description | Summary of Treatment Under Plan |
| --- | --- |
| Administrative Claims<br><br>Estimated at $50,000 net of retainer<br><br>(Primarily anticipated to be the professional fees and expenses of Debtor's Counsel and Appraiser) | Each Holder of an Allowed Administrative Claim except any such Holder that agrees to different treatment shall receive the Allowed Amount of such Holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Distribution Date, or such other treatment as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtor; provided, however, that Allowed Administrative Claims representing post-petition liabilities incurred in the ordinary course of business by the Debtor shall be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.<br><br>The professional fees and expenses of Debtor's counsel will be paid first from application of counsel's bankruptcy retainer.<br><br>Administrative Claims are not classified. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Priority Tax Claims<br><br>Estimated at $65,610.90 | Each Holder of an Allowed Priority Tax Claim (except any such Holder that agrees to different treatment) shall receive the Allowed Amount of such Holder's Allowed Priority Tax Claim, without post-petition interest or penalty, in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Effective Date.<br><br>Estimated Percentage of Recovery: 100% |
| Class 1 – Priority Claims<br><br>Estimated at $3,800.00 | Class 1 consists of all Priority Claims. Each Holder of an Allowed Priority Claim shall receive (1) the Allowed Amount of such Holder's Allowed Priority Claim, in Cash, on the Effective Date, (2) such other treatment as |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | may be agreed to in writing by such Holder and the Debtor, or (3) payment as otherwise ordered by a Final Order of the Bankruptcy Court.<br><br>Class 1 is Unimpaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Class 2A – Secured Tax Claims of Adams County Tax Collector – (Primary Property)<br><br>Estimated at $61,573.64 | Class 2A consists of the Allowed Secured Claims of Adams County Tax Collector ("Adams County") secured by a first priority tax lien on the Primary Property. The Holder of the Allowed Class 2A Claim shall receive in full satisfaction of the Allowed Class 2A Claim the following payment of Cash: (i), on the fifteenth (15th) day of the calendar month following the Effective Date and on the fifteenth (15th) day of each calendar month thereafter, an amount equal to one-twelfth (1/12) of the outstanding real and personal property taxes due on the Primary Property plus all accrued interest thereon through the Effective Date until such taxes are paid in full, provided that any amounts owed on the Class 2A Secured Tax Claim shall paid in full from the Separate Property Sale Proceeds within thirty (30) days of the Closing of the Separate Property Sale. Adams County shall retain any lien on the Primary Property to secure unpaid property taxes until such Allowed Secured Claim is paid as provided in this Plan.<br><br>Class 2A is Impaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Class 2B – Secured Tax Claims of Adams County Tax Collector – (Separate Property) | Class 2B consists of the Allowed Secured Claims of Adams County Tax Collector ("Adams County") secured by a first priority tax lien on the Separate Property. The Holder of the Allowed Class 2B Claim shall receive in full satisfaction of the Allowed Class 2B Claim the following payment of Cash: (i), on the fifteenth (15th) day of the calendar month following the Effective Date and on the fifteenth (15th) day of each calendar month thereafter, an amount equal to one-twelfth (1/12) of the outstanding real and personal property taxes due on the Separate Property plus all accrued interest thereon through the Effective Date until such taxes are paid in full, provided that any amounts owed on the Class 2B Secured Tax Claim shall paid in full from the Separate Property Sale Proceeds within thirty (30) days of the closing of the Separate Property Sale. Adams County shall retain any lien on the Separate Property to secure unpaid property taxes until such Allowed Secured Claim is paid as provided in this Plan. |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Class 2B is Impaired under the Plan. <br><br> Estimated Percentage of Recovery: 100% |
| Class 3 – Secured Claims of Valley National Bank (The Park Avenue Bank) <br><br> Estimated at $1,580,195.03 | Class 3 consists of the Allowed Secured Claim of Valley National which shall be treated as follows: <br><br> (1)   The Property will be listed for Sale with a Sale Agent prior to or on the Effective Date; <br><br> (2)   The Reorganized Debtor will continue to operate the warehouse and distribution business and market the Primary Property during the Sale Period; <br><br> (3)   The Reorganized Debtor will sell the Primary Property during or at the expiration of the Sale Period free and clear of all Liens with all Liens to attach to the Sale Proceeds; <br><br> (4)   In the event the Primary Property is not sold prior to the expiration of the Sale Period, Primary Property will be sold to the highest and best offer submitted at an absolute sealed bid auction (or other similar sale process) (the "Auction") or otherwise disposed of in accordance with State law within thirty (30) days of the expiration of the Sale Period; <br><br> (5)   Prior to the Confirmation Hearing, the Debtor will file any adversary proceeding to determine the extent, validity, and priority of Valley National or to avoid any lien of Valley National pursuant to Section 548 of the Bankruptcy Code; <br><br> (6)   On the Sale Date, the Sale Proceeds and any Cash remaining in the Secured Claims Fund Account will be paid to the Holders of the Allowed Secured Claims secured by the Primary Property in accordance with the priority of the respective Lien(s) on Property, to the extent not previously satisfied by the Separate Property Sale Proceeds, up to the amount of the Allowed Secured Claim; <br><br> (7)   In the event the Sale of the Primary Property is accomplished pursuant to the Auction described in subparagraph (iv) above, the Holder of an Allowed Secured Claim may exercise its Credit Bid Right at the Sale and may offset such bid by the amount of such Holder's Allowed Secured Claim secured by the |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Primary Property by submitting a competing bid within ten (10) days of written notice of the Debtor's selection of the highest and best offer at the Auction; |
| | (8) During the Sale Period, the Reorganized Debtor shall continue to provide insurance on the Primary Property and shall provide Valley National with proof of such insurance; |
| | (9) During the Sale Period, commencing on the later of (a) the fifteenth (15th) day of the second calendar month following the Effective Date or (b) fifteen (15) days after any order or judgment determining the extent, validity, and priority of Valley National's Lien on the Primary Property becomes a Final Order, the Reorganized Debtor will make monthly interest payments to Valley National in an amount as may be agreed between the Debtor and Valley National or as determined by the Bankruptcy Court as necessary to satisfy the requirements of Section 1129(b) of the Bankruptcy Code; and |
| | (10) Valley National shall retain its Lien on the Primary Property unless and until (a) such Lien is determined to be avoided by the Bankruptcy Court or (b) until the closing of the Sale and satisfaction from the Sale Proceeds. |
| | Class 3 is Impaired under the Plan. |
| | Estimated Percentage of Recovery: 100% |
| Class 4 – Secured Claim of Marshall & Ilsley Bank<br><br>Asserted at $2,842,542.67 | Class 4 consists of any Secured Claim of Marshall & Ilsley Bank ("M&I Bank"), if any. To the extent any amounts owed to M&I Bank constitute a liability of the Debtor or are secured by a Lien on property of the Debtor, on the Effective Date, the Holder of the Allowed Class 4 Secured Claim shall receive Cash on the Sale Date equal to the Allowed Amount of such Claim in full satisfaction of the Allowed Class 4 Secured Claim.<br><br>M&I Bank shall retain any Lien on the Primary Property unless and until (a) such Lien is determined to be avoided by the Bankruptcy Court or (b) until the closing of the Sale and satisfaction from the Sale Proceeds.<br><br>Class 4 is Impaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| Class 5 – Secured Claim of Mississippi State Tax Commission<br><br>Estimated at $2,480.00 | Class 5 consists of the Secured Claim of the Mississippi State Tax Commission ("MSTC"). The Holder of the Allowed Class 5 Claim shall receive in full satisfaction of the Allowed Class 5 Claim Cash from the Separate Property Sale Proceeds. MSTC shall retain any Lien provided under statute to secure unpaid taxes until such Allowed Secured Claim is paid as provided in this Plan.<br><br>Class 5 is Impaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Class 6 – General Unsecured Claims<br><br>Estimated at $30,000.00 | Class 6 consists of the Unsecured Claims not otherwise classified herein. The Debtor shall pay the Holders of any Allowed Class 6 Claim an amount of Cash equal to fifty percent (50%) of such Holder's Allowed Class 6 General Unsecured Claim within ninety (90) days of the Effective Date and shall pay the remaining fifty percent (50%) of such Allowed Class 6 General Unsecured Claim within fifteen (15) days of the Closing of the Separate Property Sale.<br><br>Class 6 is Impaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Class 7 – Small Claims<br><br>Estimated at $500 | Class 7 consists of the Small Claims. Within thirty (30) days of the Effective Date, each Holder of an Allowed Small Claim shall receive the lesser of (1) one hundred percent (100%) of the Allowed amount of such Holder's Claim or (2) three hundred dollars ($300.00) in Cash, on the Effective Date, and in full satisfaction of such Holder's Allowed Small Claim.<br><br>Class 7 is Unimpaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |
| Class 8 – Equity Interests | On the Effective Date, Class 8 consists of all Equity Interests. All Equity Interests will be retained by the existing Holders of such Interests. Any Sale Proceeds or Separate Property Sale Proceeds not paid on account of Allowed claims pursuant to this Plan shall be retained by the Reorganized Debtor and used by the Reorganized Debtor as permitted under applicable law and the Debtor's corporate governing documents.<br><br>Class 8 is Unimpaired under the Plan.<br><br>Estimated Percentage of Recovery: 100% |

# ARTICLE 6
## TREATMENT OF ADMINISTRATIVE CLAIMS
## AND PRIORITY TAX CLAIMS

6.1 <u>Administrative Claims</u>.

Each Holder of an Allowed Administrative Claim (except any such holder that agrees to different treatment) shall receive the Allowed Amount of such holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Distribution Date, or such other treatment as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtor; provided, however, that Allowed Administrative Claims representing (a) post-petition liabilities incurred in the ordinary course of business by the Debtor and (b) post-petition contractual liabilities arising under loans or advances to the Debtor, whether or not incurred in the ordinary course of business, shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

6.2 <u>Priority Tax Claims</u>.

Each Holder of an Allowed Priority Tax Claim (except any such Holder that agrees to different treatment) shall receive the Allowed Amount of such Holder's Allowed Priority Tax Claim, without post-petition interest or penalty in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Effective Date.

# ARTICLE 7
## MEANS FOR EXECUTION OF PLAN

7.1 <u>Plan Funding</u>.

The Debtor will fund the payments to be made under the Plan on the Effective Date through Cash derived from operations, from the income generated from a month-to-month lease to be entered into with BLVT or other third party, and to the extent closed prior to the Effective Date, from the sale of the Separate Property.

7.2 <u>Sale of Separate Property</u>.

The Debtor will sell the Separate Property on or before July 31, 2011. The net proceeds from the sale of the Separate Property will be used to pay Priority Tax Claims and Secured Tax Claims with any excess to be deposited in the Secured Claims Fund (as defined below).

### 7.3 Funding of Operations.

The Reorganized Debtor's operations during the Sale Period will be funded by Cash generated from operations and supplemented to the extent necessary by Cash generated from the Interim Lease after the Effective Date. To the extent any claims asserted as Secured Claims are not "Allowed Claims" on the Effective Date, the income generated from the Interim lease will be used to fund and maintain a "Secured Claims Fund."

### 7.4 Sale or Refinancing of Primary Property

Any Allowed Secured Claim secured by valid and unavoidable Liens on the Primary Property and not paid in full from the Separate Property Sale Proceeds will be paid from the Sale Proceeds derived from the Sale (which may be in the form of a financing transaction, sale, and leaseback or other similar transaction) within twenty-four (24) months of the Effective Date. In order to provide an income stream to a prospective purchaser or lender, the Debtor may execute the BLVT Lease contemporaneous with the closing of the Sale.

### 7.5 Management of the Debtor.

On or after the Effective Date, the Debtor's business and affairs shall be managed by the managers and officers as provided in the Debtor's organizational documents or applicable law.

## ARTICLE 8
## EFFECTS OF PLAN CONFIRMATION

### 8.1 Term of the Automatic Stay.

All injunctions or automatic stays pursuant to Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 8.2 No Liability for Tax Claims.

Unless a taxing authority has asserted a Claim against the Debtor before the bar date established therefore, no Claim of such authority shall be Allowed against the for taxes, penalties, or interest arising out of the failure, if any, of the Debtor to have filed any tax return, including, but not limited to, any income tax return in any prior year or arising out of an audit of any return for a period before the Petition Date.

### 8.3 Disallowed Claims.

The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims to the extent such Claims are not allowable under any provision of Section 502 of the Bankruptcy Code, including, but limited to, time-barred Claims and Claims for unmatured, interest costs or attorneys' fees, unless specifically

allowable pursuant to Section 506(b) of the Bankruptcy Code; and (b) disallowing or subordinating, as the case may be, any Claims for penalties or punitive damages.

# ARTICLE 9
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1     Assumption and Rejection of Executory Contracts and Unexpired Leases.

**(a)     Rejection**.  Any executory contracts or unexpired leases that (a) have not been assumed by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date, and (b) are not the subject of a pending motion assume on the Confirmation Date, shall, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been rejected by the Debtor.  The Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the Debtor shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order shall constitute approval of such rejections.

**(b)     Assumption**.  Notwithstanding anything in Section 9.1(a) to the contrary, the Debtor may see, to assume and assign certain executory contracts and unexpired leases that will be identified in any motion to assume pending on the Confirmation Date.

**(c)     Reservation**.  Notwithstanding anything in Sections 9.1(a) and 9.1(b) to the contrary, this Section 9.1 shall not apply to any executory contract or unexpired lease that is treated otherwise under the Plan.

9.2     Cure.

At the election of the Debtor, any monetary defaults under any executory contract and unexpired lease, if any, to be assumed shall be satisfied pursuant to Section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date, or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease.  The Debtor does not believe that there are any monetary defaults in any executory contracts or unexpired leases.  In the event of a dispute regarding (i) the existence of any default, (ii) the amount of any cure payments, (iii) the ability of the Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, or (iv) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final order resolving the dispute and approving assumption.

9.3     Damages Upon Rejection.

The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Person or Governmental Unit seeking damages by reason of the rejection of any executory contract or unexpired lease; provided, however, that such Person or Governmental Unit files a Proof of Claim with the Bankruptcy Court within thirty (30) calendar days following the Confirmation Date.  To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated

for all purposes under the Plan as, an Allowed Unsecured Claim and the Holder thereof shall receive distributions as a holder of an Allowed Claim in such Class or Classes pursuant to the Plan. The Plan shall constitute notice to Persons and Governmental Units that may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a Proof of Claim in connection therewith; provided, however, that the Debtor shall have no obligation to notify such Persons and Governmental Units that the Confirmation Date has occurred.

## ARTICLE 10
## SELECTED FINANCIAL INFORMATION AND FINANCIAL PROJECTIONS

10.1 <u>Selected Financial Information</u>.

Selected financial information regarding the Debtor is contained in the Schedules, Statement of Financial Affairs, and Monthly Operating Reports that have been filed in the Bankruptcy Court and are available upon request.

## ARTICLE 11
## RISK FACTORS OF THE PLAN

11.1 <u>General</u>.

The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or Interest with such holder's own advisors.

11.2 <u>Confirmation Risks</u>.

For the Plan to be confirmed, each impaired Class of Claims and Interests is given the opportunity to vote to accept or reject the Plan, except, however, for those Classes which will not receive any distribution under the Plan and which are, therefore, considered to have rejected the Plan. With regard to the impaired Classes which vote on the Plan, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by the holders of Claims of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of such Class. The Plan will be deemed accepted by a Class of impaired Interests if it is accepted by the members actually voting on the Plan who hold at least two-thirds (2/3) in amount of the total Allowed Interests voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

If any impaired Class of Claims or Interests does not accept the Plan, pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, among other things, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." The Debtor believes that the Plan affords fair and equitable treatment for all Allowed Claims and Interests. If one or more of the impaired Classes of Claims or

Interests votes to reject the Plan, the Debtor may request that the Bankruptcy Court confirm the Plan by application of the "cramdown" procedures available under Section 1129(b) of the Bankruptcy Code. However, the can be no assurance that the Debtor will be able to use the cramdown provisions of the Bankruptcy Code for Confirmation of the Plan. Any modification of the Plan necessary to effect a cramdown may result in a different treatment of Claims and Interests than those currently afforded in the Plan, which, as to any Claim or Interest, may be less favorable, and distributions to holders of Claims and Interest may be delayed.

Any objection to the Plan by a member of a Class of Claims or Interests could either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

If certain holders of Claims or Interests (a) contest the Allowed Amount of their Claims or Interests under the Plan and successfully contend that such amount should be higher than the amount reflected on the Schedules or (b) successfully contend that the Claims or Interests of such holders of Claims or Interests should be included in a different Class under the Plan, the Bankruptcy Court may deem the Plan not feasible, and may deny Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court must make a determination, among other things, that the Plan is feasible. The Debtor believes it will possess the financial ability to pay all Claims contemplated by the Plan.

## ARTICLE 12
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

12.1 <u>General</u>.

The Bankruptcy Code requires the Debtor to describe general tax consequences that may result from confirmation of the Plan. Accordingly, the general tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below. This discussion of the federal income tax consequences of the Plan under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder of Claims and Equity Interests may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of taxpayers holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE**

**TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.**

12.2 Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests.

(a) **Consequences to Holders of Secured Claims**. The following discussion assumes that each Holder of an Allowed Secured Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC. If an Allowed Secured Claim remains secured by a Lien on the Debtor's Assets, the Holder of such Claim should not recognize a gain or less except to the extent Collateral securing such Claim is changed, and the change in Collateral constitutes a "significant modification" of the Allowed Secured claim within the meaning of Treasury Regulations promulgated under Section 1001 of the IRC. If an Allowed Secured Claim is paid in full in Cash, the Holder should recognize a capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one (1) year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instrument(s) underlying its Allowed Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

(b) **Consequences to Holders of Priority Claims**. To the extent that the Holder of an Allowed Priority Claim receives a Distribution under the Plan, such Holder should recognize such Distribution as ordinary income and submit the appropriate withholdings based on that Holder's particular circumstances. Any appropriate withholdings shall be made from such Distributions.

(c) **Consequences to Holders of Unsecured Claims**. To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim.

To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

(d) **Consequences to Holders of Equity Interests**. Riverside is recognized as a "pass through" entity under the IRC. As such, the tax consequences of Riverside's generation of a profit or loss in a given year generally "pass through" to

Riverside's Equity Holders. The allocations of the profits and losses are generally governed by the ownership allocation of the company. As such, the tax consequences of the Plan will vary depending on the specific circumstances of each Equity Holder.

12.3 <u>Certain U.S. Federal Income Tax Consequences of the Plan to Riverside</u>.

Because Riverside is a limited liability company, it is a "pass through" entity. As such, the Plan will have relatively few direct federal income tax consequences to Riverside. Instead, these tax consequences must be analyzed at the Equity Holder's level, as discussed above.

12.4 <u>Backup Withholding and Reporting</u>.

The Debtor will withhold all amounts required by law to be withheld from payments subject to federal taxes, if any, and will comply with all applicable reporting requirements of the IRC.

12.5 <u>IRS Circular 230 Notice</u>.

Any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the IRC or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

## ARTICLE 13
## ALTERNATIVES TO THE PLAN

13.1 <u>Best Interests of Creditors and Members</u>.

Even if a plan is accepted by each class of creditors and equity security holders, in order to confirm a plan of reorganization, the Bankruptcy Court must independently determine that the plan is in the best interests of all classes of creditors and equity security holders impaired by the plan. The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class of creditors and equity security holders would receive if a debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 cases were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds derived from a forced "fire" sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the collateral and, then, by the costs and expenses of liquidation, as well as by other administrative

expenses and costs of both the Chapter 7 case and its Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, all unpaid expenses incurred by the debtor in this Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself could trigger certain priority claims, such as claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business, such as litigation costs and claims arising from the wind-down of the debtor's operations during the Chapter 7 case. Those administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of equity interests.

In the event that proceeds remain after satisfaction of all allowed secured claims, administrative claims, and priority claims, the remaining assets would be distributed pursuant to the "absolute priority rule," which requires that no junior creditor receive any distribution until all senior creditors are paid in full, and no equity holder receive any distribution until all creditors are paid in full, with interest. Once the Bankruptcy Court ascertains the projected recoveries of secured creditors, priority claimants, general unsecured creditors and equity security holders in a liquidation, those recoveries are compared with the distribution offered to each class of claims or interests under the plan or reorganization to determine if the plan is in the best interests of creditors and equity security holders of each class.

The Debtor believes that a Chapter 7 liquidation would result in a much reduced value for the Primary Property than would result if the Property is sold or refinanced under the Plan. While secured and unsecured creditors may ultimately be paid in full, additional administrative expenses would result from the appointment of a trustee or trustees and corresponding professionals. Furthermore, the Debtor believes that additional claims could result from cessation of its operations and the winding up of its affairs.

13.2 <u>Other Alternatives to the Plan</u>.

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization. Such competing plan of reorganization might involve either a reorganization and continuation of the Debtor's business or an other method of liquidation of its assets.

**THE DEBTOR BELIEVES THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE LIQUIDATION ALTERNATIVES BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN LIQUIDATION. IN ADDITION, OTHER ALTERNATIVES WOULD INVOLVE SIGNIFICANT DELAY, UNCERTAINTY, AND SUBSTANTIAL ADDITIONAL ADMINISTRATIVE COSTS.**

## ARTICLE 14
## PREFERENCES, FRAUDULENT CONVEYANCES
## AND OTHER CAUSES OF ACTIONS

14.1 <u>In General</u>.

Pursuant to Section 547 of the Bankruptcy Code, a debtor-in-possession may avoid ad a preference a transfer of property made by the debtor to or for the benefit of a creditor on account of an antecedent debt while the debtor was insolvent, if that creditor received more than it would have received in a liquidation of the debtor under Chapter 7 of the Bankruptcy Code ha the payment not been made and if the payment was made (i) within ninety (90) days before the date that the bankruptcy case commenced, or, (ii) if the creditor is an "insider" as defined in the Bankruptcy Code, within one (1) year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of its bankruptcy case. The power to avoid preferences is subject to a number of exceptions set forth in Section 547 of the Bankruptcy Coe, including one exception applicable to the payment of obligations in the ordinary course of business on ordinary business terms. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case) for which the transferee was not repaid, such extension constitutes an offset against any otherwise recoverable transfer of property. If a transfer is recovered by the debtor, the transferee obtains a general unsecured claim against the debtor to the extent of the recovery.

Pursuant to Section 548 of the Bankruptcy Code, a debtor-in-possession may avoid a fraudulent transfer of property, including the granting of a security interest in property, made while the debtor was insolvent or which rendered the debtor insolvent, if the debtor received less than reasonably equivalent value in exchange for such property and if the transfer was made within two (2) years before the commencement of the bankruptcy case. Pursuant to Section 544 of the Bankruptcy Code, a debtor-in-possession may avoid a transfer of property that is avoidable under applicable non-bankruptcy law. Section 544 of the Bankruptcy Code enables a debtor to apply applicable state laws, including fraudulent conveyance laws, to avoid a transfer of property.

14.2 <u>Specific Avoidance Actions</u>.

The Debtor believes that the mortgage and debt obligations now held by Valley National may be avoidable under Sections 548 and 544 of the Bankruptcy Code as transfers made and obligations incurred are far less than reasonably equivalent value and represent secure debts that were beyond the Debtor's ability to pay as such debts matured. In addition to the grounds set forth in the Objection to M&I Bank's Claim, the Debtor believes that any "equitable lien" asserted by M&I Bank in the Primary Property would be avoidable by the Debtor pursuant to the "strong arm" powers provided under Section 544 of the Bankruptcy Code.

14.3 <u>Retention and Enforcement of Claims or Interests</u>.

The Debtor's schedules describe a number of claims the Debtor intends to pursue after the Effective Date.  The amount of recovery on those causes of action cannot be predicted at this time due, among other things, to the potential collectability of the prospective Defendants.  However, pursuant to Section 1123(b)(4) of the Bankruptcy Code, the Debtor shall retain and have the exclusive right to enforce against any Person or Governmental Unit any and all Causes of Action and rights of the Debtor that arose both before and after the Petition Date, including the rights and powers of a trustee and Debtor-In-Possession and all causes of action granted pursuant to and still existing under Sections 502, 544, 545, 547, 548, 549, 550, 551, and/or 553 of the Bankruptcy Code, whether by affirmative claim, defense, off-set, or right of set-off or through other legal or equitable claims or defense. To the extent of any recovery of Cash arising from any claim or cause of action asserted by the Debtor (a "<u>Recovery</u>"), the net proceeds of such recovery, after payment of all reasonable attorney fees and other costs incurred in obtaining such Recovery shall be distributed (a) on a Pro Rata Basis on account of any Allowed Claim that is not paid in full on the Effective Date or otherwise provided in the Plan up to the amount necessary to pay such Allowed Claim in full (inclusive of any payments otherwise made under the Plan); (b) to interest on such Allowed Claim and (c) Pro Rata on account of Equity Interests.

## ARTICLE 15
## MISCELLANEOUS

15.1 <u>Source of Information</u>.

The Debtor has used its books and records, members' and managers' knowledge, experience, and advice, historical financial statements, information, and opinions of legal counsel in the preparation of the information set forth in this Disclosure Statement.

15.2 <u>Modification of Plan</u>.

The Debtor may propose amendments to, or modifications of, the Plan under Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other Order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of the Holders of Allowed Claims are not materially and adversely affected**.**

## ARTICLE 16
## CONCLUSION


THE DEBTOR URGES HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY FILING THEIR BALLOTS WITH THE BANKRUPTCY COURT NO LATER THAN 4:00 P.M. EASTERN TIME, ON _____, 2010.


Dated: Tampa, Florida
      July 13, 2010


**BULOVA TECH RIVERSIDE, LLC**


By:    */s/ John Stanton*
          John Stanton, Manager